Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| MARINA PUELLO PIÑA<br><br>Apelante<br><br><br>V.<br><br><br>BADILLO SAATCHI &<br>SAATCHI<br><br>Apelados | KLAN202500217 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.:<br>SJ2022CV00604<br><br>Sobre:<br>Ley 80 (Despido Constructivo)<br>Ley 100, Ley 69 (Discrimen por Edad y Género)<br>Ley 2 (Procedimiento Sumario) |

Panel integrado por su presidenta; la Juez Lebrón Nieves, el Juez Adames Soto y la Jueza Martínez Cordero

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 13 de agosto de 2025.

El 13 de marzo de 2025, compareció ante este Tribunal de Apelaciones, la señora Marina C. Puello Piña (en adelante, parte apelante o señora Puello Piña), por medio de *Apelación.* Mediante esta, nos solicita que revisemos la *Sentencia* emitida el 28 de febrero de 2025 y notificada el 5 de marzo de 2025, por el Tribunal de Primera Instancia, Sala Superior de Bayamón. En virtud del aludido dictamen, el foro *a quo* declaró Ha Lugar la solicitud de desestimación, al amparo de la Regla 39.2 (c) de Procedimiento Civil, 32 LPRA Ap. V, R. 39.2 (c), presentada por Badillo Saatchi & Saatchi (en adelante, parte apelada o Badillo).

Por los fundamentos que adelante se exponen, se *confirma* el dictamen apelado.

Número Identificador

SEN2025 _____

**I**

Los hechos que suscitaron la controversia de epígrafe se remontan a una *Querella* sobre Ley 80 (Despido Constructivo), *infra,* Ley 100, *infra,* Ley 69 (Discrimen por Edad y Género), *infra,* Ley 2 (Procedimiento Sumario), *infra,* incoada el 30 de enero de 2022 por la parte apelante, en contra de la parte apelada.

En apretada síntesis, la parte apelante alegó en su *Querella* que, comenzó a trabajar para Badillo Saatchi & Saatchi el 1ro. de marzo de 1998 como Vice Presidenta y Jefa de Operaciones. Adujo que, entre sus funciones estaba la aprobación de gastos de la compañía, administración de la oficina, aprobación y control de los estados financieros de la compañía, de las nóminas y de los días de vacaciones y enfermedad, asignación y aumentos de salarios del personal, labores de supervisión del personal, negociaciones con los medios en beneficio de los clientes, negociar los incentivos por volumen de la agencia, supervisión directa de las cuentas de Claro y Banco Popular, así como negociar los contratos de compensaciones con los clientes directos de Media Net. Arguyó que, a pesar de ser una persona productiva y con vasto conocimiento para ejercer sus funciones como Vice Presidenta, fue despojada de sus funciones y estas fueron otorgadas a otro empleado de la empresa de género masculino, lo que, a su juicio, constituye un acto discriminatorio en su contra en la modalidad de discrimen por edad y género. Añadió que, su patrono fue quitándole responsabilidades hasta dejarla con la responsabilidad de negociar los incentivos por volumen de Publicis Groupe, negociar las tarifas de los clientes que le solicitaban, incluyendo negociar directamente las tarifas de Claro y Banco Popular sin que el cliente supiera de su participación, y velar, pero sin autoridad, el proceso de trabajo, coordinar presentaciones con los medios para los Grupos de Publicis. Afirmó que, lo anterior le produjo inseguridad en el empleo y ansiedad por

sentirse desplazada, que se convirtió en depresión, por lo cual tuvo que recibir tratamiento psicológico. Asimismo, alegó que, los actos del patrono crearon una situación psicológica tal, que se convirtió en una condición onerosa e insoportable al sentirse inútil y desplazada, lo cual la obligó a renunciar el 30 de septiembre de 2021, en un acto de despido injustificado. Reclamó una mesada por despido injustificado al amparo de la Ley 80, *infra*, que valoró en la suma de ciento cuarenta y cuatro mil ochocientos dieciséis dólares con cincuenta centavos ($144,816.50), daños por las alegadas actuaciones discriminatorias y angustias mentales en la suma de ciento cincuenta mil dólares ($150,000.00), más los salarios dejados de percibir y daños económicos, así como una doble compensación del importe de los daños sufridos.

En respuesta, la parte apelada presentó el 20 de marzo de 2022 su *Contestación a Querella*, en la que eminentemente, negó las alegaciones. Entre sus defensas afirmativas, levantó que la Querella tal y como redactada, deja de exponer una reclamación que justifique la concesión de un remedio, inexistencia de una causa de acción, prescripción, cosa juzgada e impedimento colateral por sentencia, que la renuncia fue una libre y voluntaria, no haber incurrido en actos negligentes, culposos ni discriminatorios en contra de la señora, que la querellante no se quejó en ningún momento, a pesar del patrono tener disponible un procedimiento para atender quejas, entre otras.

A pesar de haberse solicitado un cambio del trámite sumario al ordinario, durante la vista del 31 de agosto de 2022, el foro *a quo* determinó que el mismo continuaría mediante el trámite sumario, aunque se permitió la ampliación del descubrimiento de prueba.

Acaecidas varias incidencias procesales innecesarias pormenorizar, el 21 de mayo de 2024, se celebró la Conferencia Preliminar entre Abogados y el Juicio en su Fondo se llevó a cabo

los días 3, 4, 6 y 10 de febrero de 2025. Durante la vista en su fondo las partes estipularon los siguientes documentos:

Exhibit I- Expediente de personal de la querellante

Exhibit II- Expediente médico de la querellante en la oficina de la Dra. Nyrma E. Ortiz Vargas.

Evaluada y aquilatada la prueba desfilada, el 28 de febrero de 2025, notificada el 5 de marzo de 2025, el Tribunal de Primera Instancia emitió *Sentencia*, cuya revisión nos atiene. El misma el foro primario consignó las siguientes determinaciones de hechos:

1. La parte querellante, Marina C. Puello Piña entabló una reclamación contra Badillo Saatchi & Saatchi el 30 de enero de 2022 en la que reclamó haber sido víctima de despido constructivo y discrimen por edad y género.

2. La parte querellada Badillo Saatchi & Saatchi, es una corporación autorizada en Puerto Rico.

3. La querellante fue contratada el 1 de marzo de 1998 por Badillo. Luego pasó a ser parte de Medianet empresa de Badillo y otros dueños.

4. Medianet fue adquirida por Publicis Groupe en 2014 y operó como Zenith Optimedia.

5. La querellante renunció el 30 de septiembre de 2021.

6. La querellante ocupaba el puesto de Vice President y Media Director al momento de su renuncia.

7. Dra. Nyrma Ortiz Vargas: Psicóloga de la querellante desde 2018 hasta el 6 de julio de 2023. Compareció como perito de ocurrencia. Este es su primer caso como "perito" y no es psicóloga forense. La querellante le indicó tener problemas familiares con el esposo y su madre. También le manifestó su deseo de renunciar a la empresa y acogerse al retiro.

8. Conforme el DSM 5, el diagnóstico para la Sra. Puello fue de trastorno de depresión mayor, único, leve y trastorno de ansiedad, leve.

9. Las terapias cesaron cuando la paciente (Sra. Puello), le notificó haber completado las metas del tratamiento.

10. La Sra. Puello acudió a recibir atención psicológica a los 2 años de estar disgustada con el trabajo.

11. Del testimonio de la Dra. Ortiz Vargas nunca surgió que la Sra. Puello le hubiera manifestado que estaba siendo hostigada o maltratada en el trabajo.

12. Del testimonio de la Dra. Ortiz Vargas surge que la Sra. Puello le manifestó no tenerle respeto al nuevo jefe, y confirma le aumentaron el sueldo.

13. La Sra. Puello comenzó en 1998 a trabajar en Badillo como Directora de Medios y en ese momento se reportaba a Raquel Rivera y Erasto Freytes.

14. Luego se creó Medianet y Julio Toro la nombró VP. Ella se reportó a él hasta su retiro en 2016.

15. La Sra. Puello nunca fue accionista o dueña de Badillo, Medianet, Zenith o Publicis.

16. Los dueños de Badillo eran Julio Toro, Ángel Collazo Schwartz y Badillo.

17. Medianet operó hasta 2014 bajo el control de Julio Toro.

18. Julio Toro vendió su participación a Publicis en 2014.

19. Publicis es una compañía extranjera que llegó con sus manuales o sistemas que aplicaban ellos y, por ende, a la Sra. Puello. Por ejemplo, estos tenían su manual de empleados, hacían su propia compra de materiales, y se encargaba de pagar su renta.

20. Publicis le proveyó a la Sra. Puello estacionamiento y oficina para trabajar. Las tareas que dej[ó] de hacer, como por ejemplo la compra de materiales, se hacía directamente de Publicis.

21. Desde la venta de Medianet en 2014 hasta su retiro en 2016, la Sra. Puello no le hizo reclamo alguno al Sr. Toro excepto por una ocasión que fue expulsada de una reunión en el 2016 por él.

22. La Sra. Puello no fue parte en las negociaciones de venta de Medianet.

23. Al tribunal no le mereció crédito el testimonio de la querellante que en Badillo no había métodos o procedimientos para canalizar las quejas de la empresa.

24. La parte querellante no presentó prueba documental alguna indicativa de descontento, discrimen, hostigamiento.

25. La parte querellante no presentó prueba testifical alguna indicativa de discrimen y hostigamiento.

26. Alfredo Linares, vino de España y sustituyó al Sr. Julio Toro como Director de Medios de Publicis.

27. La demandante entiende que el puesto que ocupó Alfredo Linares le correspondía.

28. Puello nunca llevó queja alguna a Recursos Humanos.

29. El Exhibit 1 A y B demuestran que la posición que ocupaba la Sra. Puello era como VP Media Director.

30. El puesto como VP Media Director nunca le fue removido.

31. El testimonio de la Sra. Puello confirmó que sus funciones variaron a través de los años con las diferentes compañías.

32. Damaris Negrón Montero, testigo de la querellante, trabajó en Medianet desde 2008 al 2012 o 2013. Se fue por unos 2 años y regresó con Zenith.

33. Esta testificó que la Sra. Puello fue su jefa para sus años laborando en Medianet y que supervisaba a unas 20 personas y se encargaba de mantener los suministros completos desde alimentos hasta papel, coordinaba con los medios y clientes, se le solicitaban las vacaciones.

34. Esta confirmó que la posición de la Sra. Puello era de VP Media Director.

35. A su regreso con Zenith no estaba bajo la supervisión de la Sra. Puello.

36. Francisco Priegues Valdivia, testigo de la querellante. Este comenzó su relación profesional con la Sra. Puello cuando trabajaba como VP en Telemundo y ella como VP de Badillo. Luego, en 2006 Julio Toro le ofreció trabajo en Medianet 5 como VP de nuevos negocios y como accionista minoritario. La Sra. Puello continuaba siendo VP de operaciones.

37. La querellante no presentó prueba alguna que ejerciera las funciones de Jefa de Operaciones para Medianet en 2014, o que dichas funciones y título le fueron removidas luego de la venta.

38. Aunque se presentó como prueba la carta de renuncia, no se discutieron los pormenores y el contenido de la misma.

39. La querellante manifestó que sus funciones fueron repartidas entre 1 hombre y 2 mujeres. Sin embargo, no indicó las edades de las personas que alegadamente la sustituyeron. Sólo se limitó a decir los nombres de estos, siendo el hombre el Sr. Alfredo Linares.

40. La Sra. Puello testificó que en algún momento en 2016 se comunicó con Cristina Echevarría sobre su malestar en la compañía. Sin embargo, nunca le dio seguimiento, ni hay evidencia o confirmación de dicha conversación.

41. El sueldo de la querellante no fue afectado durante sus años laborando para la parte demandada.

42. La Sra. Puello se describió como "una persona controladora y agresiva" ante su psicóloga. Según su testimonio; ésta negociaba con los clientes y era la encargada de los "clientes difíciles". Sin embargo, el comportamiento laboral de falta de acción de su reclamación no coincide con las alegaciones presentadas.

En su dictamen, el foro *a quo* dispuso:

En el sano ejercicio de nuestras facultades adjudicativas, y luego de realizar un estudio minucioso sobre los documentos y testimonios vertidos ante este foro, corresponde a este Tribunal adjudicar en estricto derecho la presente controversia. Sin necesidad de ulteriores procedimientos, procedemos a así hacerlo.

Así pues, resolvemos que la parte querellante no probó sus reclamaciones al amparo de la Ley 80-1976, Ley 100-1959 y Ley 69-1985.

Conforme a todos los presupuestos fácticos, legales y jurisprudenciales enunciados en la presente decisión, este Tribunal procede a declarar **HA LUGAR** la solicitud de desestimación por insuficiencia de la prueba presentada en sede judicial por la parte querellada Badillo (conforme a la Regla 39.2 (c) de las de Procedimiento Civil, *supra*), y en su consecuencia, procedemos a dictar Sentencia ordenando la desestimación de la Querella de epígrafe en todas sus partes, sin la imposición de costas y honorarios de abogado.

En desacuerdo, la parte apelante acudió ante este foro revisor intermedio mediante recurso de *Apelación* en el cual esgrimió los siguientes señalamientos de error:

A. ERR[Ó] EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR LOS HECHOS ESTABLECIDOS EN LA SENTENCIA.

B. ERR[Ó] EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DESESTIMAR LA DEMANDA AL AMPARO DE LA REGLA 39.2.

C. ERR[Ó] EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO DICTAR SENTENCIA A FAVOR DE LA APELANTE.

Mediante nuestra *Resolución* del 17 de marzo de 2025 y de conformidad con el anterior Reglamento de este Tribunal, le ordenamos a la parte apelante que nos acreditara en o antes del viernes 21 de marzo de 2025, haber notificado copia del recurso de

epígrafe a la parte apelada, ello de conformidad con la Regla 13 (B)[1] y al Tribunal de Primera Instancia, conforme a lo dispuesto por la Regla 14[2]. Le apercibimos que, el incumplimiento con lo ordenado, daría lugar a la desestimación del recurso.

Por otro lado, en vista de que, se cuestiona la apreciación que de la prueba hiciera el Tribunal de Primera Instancia, le ordenamos a la parte apelante que en el término de diez (10) días, contados a partir de la presentación de la apelación, nos acreditara el método de reproducción de la prueba oral que se proponía utilizar, según establecido en la Regla 29[3]. Le indicamos que, en la eventualidad de que la parte apelante se propusiera utilizar la transcripción de la prueba oral, debería tramitar en los próximos diez (10) días una regrabación de la Vista en su Fondo ante el Tribunal de Primera Instancia.

Además, le concedimos a dicha parte apelante el término de treinta (30) días contado a partir de la entrega de la regrabación de los procedimientos, para presentar la transcripción de la prueba ante este Tribunal.

Por otro lado, le concedimos a la parte apelada, el término de veinte (20) días para presentar sus objeciones a la transcripción contado desde que ésta fuese presentada ante este Tribunal con el apercibimiento de que transcurrido el referido término sin que se hubiese objetado la transcripción, este Tribunal acogería la misma como estipulada por las partes.

Asimismo, le indicamos a la parte apelante que, de entender que presentaría un alegato suplementario, dicha parte tendría treinta (30) días, a partir de que se acogiera la transcripción de la prueba oral, para presentar el mismo, en el cual debía hacer

---

[1] 4 LPRA Ap. XXII-B, R. 13 (B).
[2] 4 LPRA Ap. XXII-B, R. 14.
[3] 4 LPRA Ap. XXII-B, R. 29.

referencia específica a las porciones de la Transcripción de la Prueba Oral que sean relevantes a sus señalamientos de error.[4]

Por último, le concedimos a la parte apelada tendrá treinta (30) días para presentar su oposición al recurso, a contarse desde que se acogiera la transcripción presentada o desde que la parte apelante presentase su alegato suplementario. De no presentarse la transcripción ordenada, el término dispuesto para presentar el alegato en oposición se contaría a partir del día en que se debió haber presentado la misma. Le apercibimos a la parte apelada que, en caso de no comparecer dentro dicho término, el caso se entendería perfeccionado para su adjudicación final.

Luego de los trámites y rigor y en cumplimiento con lo ordenado, el 11 de junio de 2025, la parte apelante compareció mediante *Alegato Suplementario.* A su vez, la parte apelada presentó su *Alegato en Oposición a Apelación* el 11 de julio de 2025.

Con el beneficio de la comparecencia de las partes procedemos a resolver.

## II

### A. *Ley de Procedimiento Sumario de Reclamaciones Laborales*

Nuestro Tribunal Supremo ha señalado que, la Ley Núm. 2 de 17 de octubre de 1961, también conocida como la *Ley de Procedimiento Sumario de Reclamaciones Laborales,*[5] establece un mecanismo especial cuyo propósito esencial es la rápida consideración y adjudicación de las querellas presentadas por los obreros o empleados, primordialmente en aquellos casos de reclamaciones salariales, beneficios o derechos, como lo es el pago de la mesada en caso de un despido injustificado.[6] De igual forma,

---

[4] Regla 21 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 21.

[5] 32 LPRA secs. 3118-3132.

[6] *Collazo Muñiz v. New Fashion World Corporation H/N/C Aliss*, 2025 TSPR 22; *Santiago Ortiz v. Real Legacy Assurance Company, Inc.*, 206 DPR 194, 206 (2021); *Bacardi Corporation v. Torres Arroyo*, 202 DPR 1014, 1019 (2019); *Ruiz Camilo v. Trafon Group, Inc.*, 200 DPR 254, 265 (2018); *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 793, 732 (2016).

ha dispuesto que, "[p]ara lograr este propósito, y al considerar la disparidad económica entre el patrono y el obrero, así como el hecho de que la mayoría de la información sobre los reclamos salariales o por un despido está en posesión del empleador, el legislador acortó los términos y condiciones que ordinariamente regulan y uniforman la litigación civil en nuestra jurisdicción[7]." *Gilberto Peña Lacern v. Israel Martínez Hernández*, 210 DPR 424, 434 (2022).

La Alta Curia ha destacado que, el procedimiento sumario creado por la Ley Núm. 2, *supra*, es uno abarcador que al hacer un balance de los intereses envueltos impone la carga procesal más onerosa al patrono, sin que esto signifique que éste queda privado de defender sus derechos. *Rivera v. Insular Wire Products Corp.*, 140 DPR 912, 924 (1996).

Con este mecanismo expedito se implementó un plazo corto para que el patrono conteste la querella laboral o solicite una prórroga dentro del plazo dispuesto. De esta forma, en el caso de que el patrono no conteste en un plazo de diez (10) o quince (15) días, según corresponda al distrito judicial donde fue presentada la querella y su ubicación, ni solicite una prórroga juramentada, el juez de primera instancia emitirá la sentencia y concederá el remedio solicitado, sin más citarle ni oírle.[8] En este escenario, "el incumplimiento con el plazo legal para contestar la querella o solicitar una prórroga juramentada inexorablemente impone al patrono querellado los efectos de la litigación en rebeldía, pues el tribunal primario no tiene discreción para denegar su anotación.[9]" *Gilberto Peña Lacern v. Israel Martínez Hernández,* supra.

Dispone nuestro ordenamiento jurídico que, entre las condiciones que establece el aludido estatuto, en este trámite

---

[7] *Díaz Santiago v. PUCPR et al.*, 207 DPR 339, 347 (2021).
[8] 32 LPRA sec. 3120.
[9] *Vizcarrondo Morales v. MVM, Inc.,* 174 DPR 921 (2008).

especial, es que el patrono querellado deberá "hacer una sola alegación responsiva en la cual deberá incluir todas sus defensas y objeciones, entendiéndose que renuncia a todas las defensas u objeciones que no incluya en dicha alegación responsiva".[10] Conforme a esta medida especial el patrono está impedido de enmendar su contestación a la querella para traer nuevas defensas afirmativas.[11] *Gilberto Peña Lacern v. Israel Martínez Hernández*, supra.

Asimismo, fueron incorporados al precitado estatuto, ciertas limitaciones a los mecanismos de descubrimiento de prueba que normalmente se encuentran disponibles en el curso de una litigación civil. De esta manera, conforme a la Sec. 3 de la Ley Núm. 2, *supra*, existe una prohibición hacia las partes que les impide en el proceso someterle a su oponente más de un pliego de interrogatorios o tomar más de una deposición. Igualmente, no se podrá tomar la deposición a una parte a quien anteriormente se le hubiese cursado un interrogatorio, ni someterle un interrogatorio luego de habérsele tomado la deposición, con excepción de que medien circunstancias excepcionales y el tribunal, dentro de su discreción, lo avale. Finalmente, tampoco están permitidas las deposiciones de los testigos salvo que el tribunal otorgue su consentimiento, siempre y cuando se haya justificado la necesidad para ello. *León Torres v. Rivera Lebrón*, 204 DPR 20, 31-35 (2020).

Por igual, el Máximo Foro ha resuelto que, en un procedimiento sumario laboral provisto por la Ley Núm. 2 no está permitido solicitar reconsideración de determinaciones judiciales, ya sean éstas interlocutorias o finales. *Patiño Chirino v. Parador Villa*

---

[10] Sección 3 de la Ley Núm. 2, 32 LPRA sec. 3120.

[11] *Srio. del Trabajo v. J.C. Penney Co., Inc.*, 119 DPR 660, 669-671 (1987). Ahora bien, en *León Torres v. Rivera Lebrón*, se resolvió que, al aplicar supletoriamente la Regla 13.1 de Procedimiento Civil, en el contexto de un procedimiento sumario en virtud de la Ley Núm. 2, los empleados tienen la potestad de enmendar la querella presentada bajo determinadas condiciones.

*Antonio*, 196 DPR 439, 449-450 (2016). A esos efectos, la última instancia judicial ha señalado que, "en atención a los fines que persigue la ley y a la política pública que la inspira, [...] la moción de reconsideración es incompatible con el procedimiento sumario laboral provisto por la Ley Núm. 2". *Patiño Chirino v. Parador Villa Antonio*, supra, pág. 450.

En esencia, el desarrollo jurisprudencial ha reiterado que la médula del trámite fijado para casos sobre reclamaciones de salarios consagrado en la Ley Núm. 2 es su rápida disposición. Desprovisto de esta característica, resulta un procedimiento ordinario más. *Rodríguez v. Syntex P.R., Inc.*, 148 DPR 604, 612 (1999); *Díaz v. Hotel Miramar Corp.*, 103 DPR 314, 316 (1975). En referencia a lo anterior, en *Rivera v. Insular Wire Products Corp.*, supra, pág. 928, el Tribunal Supremo enfatizó que los tribunales tienen amplia flexibilidad y discreción para manejar estos casos y resolverlos de la forma más justa, rápida y económica posible. Véase, además, *Piñero v. A.A.A.*, 146 DPR 890, 902-903 (1998). También expresó nuestro Máximo Foro que "el Tribunal de Primera Instancia guarda discreción para determinar si la querella de un obrero debe ser tramitada por la vía ordinaria, aunque el obrero reclamante considere conveniente tramitar su reclamación de forma sumaria". *Bacardí Corporation v. Torres Arroyo*, supra, pág. 1023, que cita a *Berríos v. González et al.*, 151 DPR 327, 340 (2000); *Rivera v. Insular Wire Products Corp.*, supra, pág. 927.

Por igual, el Alto Foro rechazó sostener cualquier "interpretación en extremo rígida de los esquemas procesales en materia laboral que tenga el efecto práctico de privar a los foros de instancia de la discreción necesaria para considerar y decidir controversias de forma adecuada y cabal". *Berríos v. González et al.*, supra, pág. 349. En efecto, se ha resuelto que, cuando una reclamación laboral instada bajo el proceso sumario de la Ley Núm.

2, *supra*, plantea varias causas de acción y, conforme el criterio del juzgador, las controversias resultan complejas, todas las causas de acción incluidas en la querella deben ser tramitadas en un juicio ordinario. *Íd.*

En cuanto al manejo del foro primario de los casos mediante este trámite sumario, nuestra última instancia judicial añadió que dicho foro puede separar causas de acción, consolidar trámites y, en casos complicados, hasta darles un manejo especial.[12] Además, cuando los foros de primera instancia "determinan que las actuaciones de una parte están perjudicando y entorpeciendo los procedimientos, tienen amplia facultad para prohibir, sancionar o castigar este tipo de conducta y actitud".[13]

Atinente a nuestra función revisora, a través de la enmienda a la Sec. 9 de la Ley Núm. 2, *supra*, efectuada mediante la Ley Núm. 133-2014, 32 LPRA sec. 3127, también se acortaron los periodos para solicitar revisión en casos tramitados bajo la Ley Núm. 2. De manera que, posterior a esta enmienda, las apelaciones en este tipo de litigio deben presentarse ante este Tribunal de Apelaciones dentro de los diez (10) días de la notificación de la sentencia recurrida y las peticiones de *certiorari* al Tribunal Supremo, no más tarde de veinte (20) días de notificada la determinación del foro apelativo intermedio.

### B. Ley Núm. 80 de 30 de mayo de 1976

La Ley Núm. 80 de 30 de mayo de 1976, conocida como la Ley sobre Despidos Injustificados (Ley Núm. 80), 29 LPRA sec. 185a *et seq.*, según enmendada, regula las acciones relacionadas con el despido de un empleado. Tiene el propósito de proteger al empleado de actuaciones arbitrarias del patrono e imponer remedios

---

[12] *Berríos v. González et al.*, supra, pág. 349; *Rivera v. Insular Wire Products Corp.*, supra, págs. 928-930.
[13] *Íd.* pág. 930.

económicos que desalienten la práctica de despedir a los empleados injustificadamente. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 771 (2022); *González Santiago v. Baxter Health Care*, 202 DPR 281, 291 (2019); *Romero et als. v. Cabrer Roig et als.*, 191 DPR 643, 649-650 (2014); *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015).

En consonancia con su propósito, dicha pieza legislativa establece que "aquellos empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) están contratados sin tiempo determinado; (2) reciben una remuneración, y (3) son despedidos de su cargo, sin que haya mediado una justa causa", tienen derecho al pago de una compensación por su patrono (además del sueldo devengado), típicamente denominada como la mesada. *Rodríguez Gómez v. Multinational Ins.,* 207 DPR 540, 550 (2021); *Indulac v. Unión*, 207 DPR 279, 298 (2021).

No obstante, es meritorio destacar que, según se ha establecido doctrinalmente, [**n**]**uestro ordenamiento laboral no prohíbe el despido de un empleado.** Más bien protege "de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de su empleo […] a la vez que otorg[a] unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado".[14] Es decir, nuestro ordenamiento laboral busca proteger los derechos de los trabajadores con el fin de establecer un balance en las relaciones entre patronos y empleados.[15] Por ello, la *Ley de Indemnización por Despido sin Justa Causa,* mejor conocida como Ley Núm. 80, *supra,* tiene como propósito proteger el derecho de los trabajadores ante acciones "arbitrarias y caprichosas" de los patronos. En ese sentido, esta

---

[14] Exposición de Motivos, Ley de Indemnización por Despido sin Justa Causa, Ley Núm. 80 de 30 de mayo de 1976, 1976 LPR 267, 268. Véase, además: *Feliciano Martes v. Sheraton*, 182 DPR 368 (2011); *Vélez Cortés v. Baxter,* 179 DPR 455 (2010), citando a *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364 (2001).
[15] *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 903 (2011).

normativa le impone el pago de una indemnización conocida como "mesada" al patrono que sin justa causa despida a un empleado que es contratado por un periodo de tiempo indeterminado. *Segarra Rivera v. Int'l Shipping et al.*, págs. 982-983.

Cabe destacar que, la Ley Núm. 80, *supra*, sufrió una serie de enmiendas por medio de la Ley Núm. 4 de 26 de enero de 2017, conocida como Ley de Transformación y Flexibilidad Laboral. Como es sabido, la Ley Núm. 80, *supra*, le imponía al patrono el peso de la prueba y el deber de rebatir la presunción de que el despido había sido injustificado, no obstante, la Ley Núm. 4-2017 "[e]liminó de la ley la frase que le imponía el peso de la prueba al patrono en los casos de [Ley Núm. 80]". *Ortiz Ortiz v. Medtronic*, supra, pág. 776 citando a E. García García, *El legado e implicaciones de la Reforma Laboral de 2017*, 86 Rev. Jur. UPR 1087, 1156 (2017).

Previo a la enmienda de la Ley Núm. 80, una vez un empleado instaba una causa de acción contra su patrono al amparo de la Ley Núm. 80, *supra*, nuestro ordenamiento legal disponía que "el patrono vendrá obligado a alegar, en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo justificado para quedar eximido de cumplir con el pago de la mesada". 29 LPRA 185k(a). *Feliciano Martes v. Sheraton*, supra, pág. 385.

Por otro lado, la aplicación de la Ley Núm. 4-2017 es prospectiva, su Art. 1.2 dispone que "[l]os empleados contratados con anterioridad a la vigencia de esta Ley, continuarán disfrutando los mismos derechos y beneficios que tenían previamente, según lo dispuesto expresamente en las secciones de [e]sta". 2 LPRA sec. 121a; *Ortiz Ortiz v. Medtronic*, supra, pág. 776.

Respecto a la justa causa, el Art. 2 de la Ley Núm. 80, *supra*, 29 LPRA sec. 185b, "[...] establece una lista, no taxativa, de las circunstancias que constituyen "justa causa" para el despido de un

empleado, seis de ellas atribuidas al empleado y tres al patrono". *Lugo Montalvo v. Sol Meliá Vacation, supra,* pág. 231. Esto se debe a que "el concepto 'justa causa' es dinámico, puesto que se nutre de múltiples y fluidas situaciones imposibles de prever". *SLG Torres-Matundan v. Centro Patología, supra*, pág. 930*; Srio. del Trabajo v. G.P. Inds., Inc.*, 153 DPR 223, 243 (2001).

En lo pertinente, conforme dispone la precitada Ley 80, se entenderá justa causa para el despido de un empleado, entre otras:

[…]

(d)  Cierre total, temporero o parcial de las operaciones del establecimiento.  En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con esta sección.

(f)  Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento. Art. 2 de la Ley Núm. 80, *supra,* 29 LPRA sec. 185b.

Por otro lado, según h establecido la Alta Curia, en el contexto de la Ley Núm. 80, el término "despido" es uno amplio y **no** se limita estrictamente a la gestión concreta de un patrono de prescindir de los servicios de un empleado.  *León Torres v. Rivera Lebrón,* supra.

Así pues, el esquema normativo incluye, entre las definiciones del término "despido", una renuncia ocasionada por "actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar[,] tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra".  Art. 5 Ley Núm. 80, 29 LPRA sec. 185e (2017).  Es decir, el trabajador se siente tan incómodo con la situación laboral imperante en su lugar de empleo que no tiene otro remedio que abandonarlo.  Por consiguiente, el distintivo peculiar de un despido constructivo reside en que el

patrono fuerza al empleado a dimitir de su trabajo. *Rivera Figueroa v. The Fuller Brush Co., supra.* Debido a sus características particulares hemos catalogado esta modalidad de despido injustificado como "*despido constructivo o tácito*". *Íd.*

Ahora bien, para poder establecer una acción de despido constructivo, "no basta con cualquier molestia o condición antipática en el empleo y, cuando se trate de vejámenes y humillaciones, estos deben ser de magnitud sustancial". (Cita omitida). El ambiente en el empleo debe tornarse intolerable a tal nivel que la única alternativa razonable para el empleado afectado sea dimitir. *Íd.*

Dicho de otra forma:

[La] doctrina del despido tácito es una profundamente arraigada en nuestra jurisdicción. [...] Sin embargo, no puede utilizarse inflexiblemente por los obreros, cuando se encuentran en cualquier circunstancia laboral estresante. Por tal razón, sólo procede en aqu[e]llas instancias donde la prueba demuestre, mediante inferencia razonable, que la única alternativa del empleado es abandonar su empleo. C. Zeno Santiago y V.M. Bermúdez Pérez, Tratado de Derecho del Trabajo, San Juan, Pubs. JTS, T. I, 2003, págs. 101-102.

La intensidad y el alcance de la conducta patronal en controversia se examinarán desde una óptica objetiva y no desde la perspectiva del empleado promovente. Es decir, se evaluará "si una persona razonable se sentiría forzada a renunciar como resultado de las acciones del patrono". *León Torres v. Rivera Lebrón,* supra.

### C. *Ley Contra Discrimen en el Empleo*

La Asamblea Legislativa aprobó la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 146 *et seg.*, para ofrecer una protección eficaz a los trabajadores contra diversos tipos de discrimen en el ámbito laboral y así cumplir con el propósito de instrumentar el mandato constitucional basado en la igualdad en el contexto obrero-patronal. *Torres Rivera v. Econo Rial, Inc.*, 208 DPR 346 (2021). Esta ley ofrece una protección a los empleados y

candidatos a empleo contra el discrimen por parte de patronos u organizaciones obreras. *Íd.* Este estatuto prohíbe que un patrono despida, suspenda o discrimine contra un empleado por razón de edad, raza, color, sexo, origen social o nacional, condición social, afiliación política, ideas políticas o religiosas, o por ser víctima de violencia doméstica, agresión sexual o acecho. Su propósito no es otro que erradicar las prácticas discriminatorias en el empleo, propiciando así mayor igualdad de oportunidades en el área laboral. *Íd.*

El 8 de mayo de 2019, el Departamento del Trabajo y Recursos Humanos de Puerto Rico (DTRH) publicó las *Guías para la Interpretación de la Legislación Laboral de Puerto Rico,* (en adelante, *Guías para la Interpretación de la Legislación Laboral)* con el fin de expresar su posición en cuanto a ciertas leyes que regulan el empleo en el sector privado. En las referidas guías, el DTRH puntualiza las enmiendas que fueron traídas mediante la Ley 4-2018, *supra.* En particular expresa que, el Art. 6.2 de la Ley Núm. 4-2017, al interpretar las protecciones laborales relacionadas a discrimen y represalias dispone lo siguiente:

> Al aplicarse las disposiciones de cualquier ley de discrimen o represalia en el empleo, se reconocerá lo dispuesto en la legislación y reglamentación federal al igual que las interpretaciones judiciales de las mismas de aquellos tribunales con jurisdicción en Puerto Rico, a los fines de asegurar interpretaciones consistentes en cuanto a términos o disposiciones similares, salvo que las disposiciones de la legislación local requieran una interpretación distinta.

Es decir, las protecciones laborales relacionadas al discrimen y represalias se interpretarán de conformidad con la legislación, reglamentación e interpretaciones judiciales de la esfera federal.

Conforme a la interpretación del DTRH en las *Guías para la Interpretación de la Legislación Laboral* sobre el Art. 6.2 de la Ley Núm. 4-2017, en los casos que se inste una reclamación bajo el crisol de la Ley Núm. 100 de 30 de junio de 1959, se utilizará el

estándar probatorio desarrollado por el Tribunal Supremo Federal en *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973). *Guías para la Interpretación de la Legislación Laboral de Puerto Rico*, pág. 157. Bajo este estándar, primeramente, le corresponde al empleado establecer un caso *prima facie* de discrimen. *Íd.* Para establecer un caso *prima facie* de discrimen se deben alegar y probar los siguientes elementos: (1) que la persona pertenece a la clase protegida por la legislación; (2) que se encuentra cualificada para el puesto; (3) que fue objeto de una acción adversa; y (4) que se benefició a otra persona que no pertenece al mismo grupo protegido. *Íd.* pág. 158.

Así pues, una vez establecido el caso *prima facie* de discrimen, le corresponderá al patrono demostrar que existe una explicación razonable para la acción adversa en contra del reclamante y que no existe ánimo discriminatorio. *Íd.* Si el patrono cumple con lo anterior, pues entonces le corresponde a la parte demandante refutar la explicación razonable del patrono, y demostrar que la razón ofrecida por este último es un subterfugio o pretexto para justificar la acción adversa. *Íd.* El peso de convencer al tribunal recae sobre el reclamante. *Íd.*; *Ibañez v. Molinos de Puerto Rico*, 114 DPR 42, 50 (1983).

### D. Regla 39.2 (c) de Procedimiento Civil

La Regla 39.2 de Procedimiento Civil,[16] contempla la figura de la desestimación en distintas modalidades. En su inciso (a) se reconoce la facultad y discreción que posee el tribunal para desestimar una reclamación, como medida de sanción, por una parte haber incumplido con sus órdenes o por haberse infringido el cuerpo de las reglas procesales. Por su parte, el inciso (b) reglamenta las desestimaciones por inactividad. Mientras que, el inciso (c) primordialmente se encarga de las desestimaciones por insuficiencia

---

[16] 32 LPRA Ap. V, R. 39.2.

de la prueba (*non-suit*). *VS PR, LLC v. Drift- Wind*, 207 DPR 253 (2021).

Nuestra última instancia judicial ha resaltado que, la Regla 39.2 de Procedimiento Civil, *supra*, no se limita a lo antedicho, sino que, en su inciso (c), más allá de atenderse las mociones de *non-suit*, también incluye, *in fine*, una disposición aplicable a otras clases de desestimaciones. En específico, establece:

> (c) [...] A menos que el tribunal en su orden de desestimación lo disponga de otro modo, una desestimación bajo esta Regla 39.2 de este apéndice y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos.

El precitado inciso ilustra el efecto generalmente atribuible a las desestimaciones. Señala que a menos que el tribunal lo disponga de otro modo, una desestimación bajo la Regla 39.2 de Procedimiento Civil, *supra* —ya fuera por incumplimiento con las órdenes del tribunal, inactividad o por insuficiencia de prueba— tiene el efecto de una adjudicación en los méritos (i.e., es con perjuicio). Incluso, la norma trasciende las desestimaciones decretadas bajo la Regla 39.2 de Procedimiento Civil, *supra*, y aclara ser igualmente aplicable cuando se trate de cualquier otra desestimación.[17]

En lo pertinente al caso que nos atiene, la Regla 39.2 (c) de Procedimiento Civil en particular, dispone:

> (a)   .....
>
> (b)   .....
>
> (c)   Después que la parte demandante haya terminado la presentación de su prueba, la parte demandada, sin renunciar al derecho de ofrecer prueba en caso de que la moción sea declarada "sin lugar", podrá solicitar la desestimación fundándose en que bajo los hechos hasta ese momento probados y la ley, la parte demandante no tiene derecho a la concesión de remedio alguno. El

---

[17] Al mismo tiempo, de su texto surge que la consecuencia prevista por la Regla 39.2(c) de Procedimiento Civil, *supra*, es inaplicable cuando la desestimación haya sido dictada por falta de jurisdicción o por haberse omitido acumular una parte indispensable. Por supuesto, tampoco aplicaría si otra norma pauta un efecto específico para determinada desestimación. Empero, en ausencia de tales excepciones, la norma detallada cobija a cualquier desestimación decretada.

tribunal podrá entonces determinar los hechos y dictar sentencia contra la parte demandante, o podrá negarse a dictar sentencia hasta que toda la prueba haya sido presentada. A menos que el tribunal en su orden de desestimación lo disponga de otro modo, una desestimación bajo esta Regla 39.2 de este apéndice y cualquier otra desestimación, excepto la que se haya dictado por falta de jurisdicción o por haber omitido acumular una parte indispensable, tienen el efecto de una adjudicación en los méritos.

El Alto Foro ha colegido que, cuando un tribunal desestima un pleito, generalmente tiene discreción para determinar si la desestimación será sin perjuicio, posibilitando así una posterior presentación de la misma reclamación. *Souchet v. Cosío*, 83 DPR 758, 762-763 (1961). Queda clara esta discreción cuando la Regla 39.2(c) de Procedimiento Civil, *supra*, menciona que la desestimación tiene el efecto de una adjudicación en los méritos, "[a] menos que el tribunal en su orden de desestimación lo disponga de otro modo [...]". Por lo tanto, en caso de no especificarse su efecto, generalmente la desestimación es con perjuicio.

### E. *Deferencia al Tribunal de Primera Instancia*

Según es sabido, las determinaciones de hechos y de credibilidad del tribunal sentenciador deben ser merecedoras de gran deferencia por parte de los foros apelativos. *Argüello v. Argüello*, 155 DPR 62 (2001); *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987); *Hernández Maldonado v. Taco Maker*, 181 DPR 281 (2011); *SLG Rivera Carrasquillo v. AAA*, 117 DPR 345, 356 (2009); *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 779 (2022).

Sin embargo, la deferencia judicial no es absoluta, pues podrá ser preterida en ciertas instancias. Nuestro Máximo Foro ha reiterado que, los tribunales apelativos "no debemos intervenir con las determinaciones de los juzgadores de primera instancia, salvo que medie pasión, prejuicio, parcialidad o error manifiesto". *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021); *SLG Rivera Carrasquillo*

*v. AAA,* supra, pág. 356; *Ortiz Ortiz v. Medtronic,* supra, pág. 778, *Pueblo v. Hernández Doble,* 210 DPR 850, 864 (2022)[18].

No obstante, "la tarea de determinar cuándo un tribunal ha abusado de su discreción no es una fácil. Empero, no tenemos duda de que el adecuado ejercicio de discreción judicial está estrechamente relacionado con el concepto de razonabilidad". *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 434-435 (2013). Es por lo que, nuestra más Alta Curia ha definido la discreción como "una forma de razonabilidad aplicada al discernimiento judicial para llegar a una conclusión justiciera". *IG Builders et al. v. BBVAPR,* 185 DPR 307, 338 (2012). Así, la discreción se "nutr[e] de un juicio racional apoyado en la razonabilidad y fundamentado en un sentido llano de justicia; no es función al antojo o voluntad de uno, sin tasa ni limitación alguna". Ello "no significa poder para actuar en una forma u otra, haciendo abstracción del resto del Derecho". (Citas omitidas). *SLG Zapata-Rivera v. J.F. Montalvo,* supra, pág. 435.

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a aplicarla.

### III

En su primer señalamiento de error, la parte apelante sostiene que, la primera instancia judicial incidió al determinar los hechos establecidos en la Sentencia. Dicho de otro modo, la parte apelante está inconforme con la apreciación de la prueba que hizo el foro primario y le imputó tener un ánimo prevenido en su contra.

En su argumentación del primer error señalado, la parte apelante, muestra su desacuerdo con la determinación de hecho número 7. En una mención incompleta de la referida determinación de hecho, la parte apelante señala que al hacer su determinación, el

---

[18] Véase también *Rodríguez et al. v. Hospital et al.,* 186 DPR 889, 908-909 (2012); *Dávila Nieves v. Meléndez Marín,* 187 DPR 750 (2013).

foro primario obvió las declaraciones de la psicóloga, a los efectos de que la apelante buscó tratamiento por problemas en el empleo.

Respecto a la referida determinación, el foro a *quo* determinó lo siguiente:

> **7.  Dra. Nyrma Ortiz Vargas: Psicóloga de la querellante desde 2018 hasta el 6 de julio de 2023. Compareció como perito de ocurrencia. Este es su primer caso como "perito" y no es psicóloga forense. La querellante le indicó tener problemas familiares con el esposo y su madre. También le manifestó su deseo de renunciar a la empresa y acogerse al retiro.**

Luego de una revisión meticulosa de la transcripción de la prueba oral, nos percatamos de que, contrario a lo argüido por la parte apelante, la aludida determinación encuentra apoyo en la prueba desfilada.[19]

Por otro lado, la parte apelante impugna la determinación de hecho número 8, que lee de la siguiente manera:

> **8.  Conforme el DSM 5, el diagnóstico para la Sra. Puello fue de trastorno de depresión mayor, único, leve y trastorno de ansiedad, leve.**

En apretada síntesis, en una escueta argumentación, la parte apelante expone su inconformidad con la determinación de hecho sobre que, conforme al DSM 5, su diagnóstico fue de trastorno de depresión mayor, único, leve y trastorno de ansiedad leve, "cuando en el juicio se estableció a saciedad, que visitó a la Dra. Nyrma Ortiz Vargas por la situación con su empleo y que dicha condición se le creó por los eventos en su trabajo. Sin embargo, la aludida determinación también está apoyada en la prueba desfilada.[20]

Como determinación número 9, el foro primario determinó que:

> **9.  Las terapias cesaron cuando la paciente (Sra. Puello), le notificó haber completado las metas del tratamiento.**

---

[19] Véase TPO del 3 de febrero de 2025, a las págs. 59, 73, 75, 35 y 46. Aclaramos que, la indicación de las páginas de la TPO no sigue un orden sucesivo, sino que depende del texto de la determinación de hecho en particular.
[20] Véase TPO del 3 de febrero de 2025, a las págs. 53 y 60.

Procede remitirnos a la página 66 de la TPO, líneas 20 a la 24, de donde surge que la doctora Nirma Ortiz Vargas declaró:

P:    Le pregunto, ¿por qué cesaron las terapias, si por alguna razón?

R:    Eh, al final, la... en la nota de julio 6 indica que el caso se cerró, ya que la paciente reportó haber completado las metas y estabilización de síntomas.

Sobre este particular, la parte apelante argumenta que las terapias terminaron cuando la apelante renunció a su empleo y dejó atrás las actuaciones de la apelada que la angustiaban. Es menester señalar que, eso no es precisamente lo que surge del testimonio vertido por la perito de ocurrencia.

Por igual, la parte apelante ataca la determinación de hecho número 11, en la que el foro a quo determinó que:

**11. Del testimonio de la Dra. Ortiz Vargas nunca surgió que la Sra. Puello le hubiera manifestado que estaba siendo hostigada o maltratada en el trabajo.**

Sobre la precitada determinación, la parte apelante señala que, en ninguna parte de la demanda se alega que fuera hostigada o maltratada más bien, desplaza y discriminada. Indica que: "Es claro que la sentencia es una realizada por la parte apelada con un marcado intento de minimizar los asuntos probados en el juicio y desviar la atención de este Tribunal, ya que son insostenibles e inconsistentes con la realidad del caso sus determinaciones de hechos.

Nuevamente vemos que la parte apelante, en lugar de identificar puntualmente las porciones de la prueba desfilada que apoya su contención, se limita a hacer una serie de inferencias que no están respaldadas por la prueba desfilada.

Como determinación de hecho **número 12**, la primera instancia judicial consignó que:

**12.  Del testimonio de la Dra. Ortiz Vargas surge que la Sra. Puello le manifestó no tenerle respeto al nuevo jefe, y confirma le aumentaron el sueldo.**

En cuanto a la referida determinación, la parte apelante arguye que: "Del testimonio de la Dra. Ortiz Vargas surge que la Sra. Puello le manifestó no tenerle respeto al nuevo jefe, y confirma le aumentaron el sueldo", nuevamente se intenta establecer un asunto no relacionado a las alegaciones del caso y que claramente son expresiones que la apelante realiza en una sesión como forma de expresar su situación laboral. Con relación al alegado aumento el expediente es claro que desde el 2014 no recibió aumento y se refiere al Apéndice IV, páginas 22-287.

Es meritorio destacar que, la aludida determinación de hecho encuentra su apoyo en las páginas 98, 99 y 136 de la TPO.

Respecto a las determinaciones 13 a la 18, sostiene la parte apelante que las mismas no tienen relevancia o importancia con las alegaciones de la demanda, por lo que nada aportan al caso, sino que constituyen un intento de desvirtuar la realidad del caso, que es que la apelante continuó con su posición y que se le fueron quitando funciones.

Indistintamente de si la parte apelante considera irrelevante o no, lo determinado por la Juzgadora de instancia, lo cierto es que dichas determinaciones se refieren a los eventos acaecidos en el entorno laboral de la apelante e inciden sobre las circunstancias que envolvieron la gestión laboral de la apelante. En ese sentido, no habremos de intervenir con la apreciación de la prueba que hizo el foro primario en cuanto a este particular.

La parte apelante relata su desacuerdo con la determinación de hecho número 19, que reza de la siguiente manera:

> **19. Publicis es una compañía extranjera que llegó con sus manuales o sistemas que aplicaban ellos y, por ende, a la Sra. Puello. Por ejemplo, estos tenían su manual de empleados, hacían su propia compra de materiales, y se encargaba de pagar su renta.**

Para la parte apelante, "es vital para atender este asunto ya que en este se establece que "Publicis es una compañía extranjera

que llegó con sus manuales o sistemas que aplicaban ellos y, por ende, a la Sra. Puello. Por ejemplo, estos tenían su manual de empleados, hacían su propia compra de materiales, y se encargaba de pagar su renta. Publicis le proveyó a la Sra. Puello estacionamiento y oficina para trabajar. Las tareas que dejó de hacer, como por ejemplo la compra de materiales, se hacía directamente de Publicis. Es obvio que la parte apelante no estableció como hecho probado las tareas que realizaba la apelante en su puesto de VP, ya que no le convenía porque quedaría expuesto las demás tareas que fueron retiradas paulatinamente por la apelada dejando a la apelante practicante sin funciones como se declaró en el juicio. Mas que un hecho establecido es una admisión de la parte apelada que realizó el proyecto de sentencia de que le quitaron a la apelante sus funciones. Cabe señalar que la apelada nunca ha tenido una política de discrimen activa con protocolo de quejas por lo que es claro que no creen en la aplicación de dicha Ley."[21]

Es preciso destacar que, la parte apelante no hace referencia a porción de la transcripción de la prueba alguna para derrotar tal determinación, por lo que, al no fundamentar su postura, tal argumento carece de mérito.

Asimismo, alude a las determinaciones de hecho número 21[22], 23, 24, 25 y 26 sin referirse puntualmente a la transcripción de la prueba oral, por lo que no nos pone en posición de intervenir con lo determinado por el foro primario.

---

[21] La parte apelante cita al Apéndice IV, paginas 22-287.
[22] La determinación de hecho número 21, que establece que: "Desde la venta de Medianet en 2014 hasta su retiro en 2016, la Sra. Puello no le hizo reclamo alguno al Sr. Toro excepto por una ocasión que fue expulsada de una reunión en el 2016 por él", es una fuera de la realidad de lo ocurrido en el caso, ya que la apelante testificó que reclamó a la directora de recursos humanos sobre sus tareas y solicitó la descripción de las mismas la cual nunca le brindaron a pesar de haberse solicitado, dicho documento se retiró como otros del expediente presentado ante el Tribunal.

Por otro lado, en cuanto a los hechos determinados números 23[23], 24 y 25, la parte apelante se limita a hacerle imputaciones a la Juzgadora de instancia de tener un ánimo prevenido, sin esbozar puntualmente los fundamentos para sostener su postura.[24] Hacer un planteamiento de tal naturaleza sin fundamentos válidos para ello, raya en la contumacia e irreverencia hacia el Tribunal.

La parte apelante alude, además, a la determinación de hecho número 26[25] y arguye que, más que aportar a sostener la determinación del TPI más bien prueba que no vino a sustituir a la apelada ya que este tenía sus funciones y Julio Toro las suyas por lo que no debía de haber sucedido el despojo de funciones a la apelante.

Empero, al igual que con las determinaciones de hechos anteriores, la parte apelante no trae ante nuestra atención alguna evidencia desfilada y admitida capaz de rebatir tal determinación de hecho, por lo que nuevamente, su planteamiento carece de mérito.

A su vez, en la determinación de hecho número 27, el foro *a quo*, estableció que: "La apelante entiende que el puesto que ocupó Alfredo Linares le correspondía". Según esboza la parte apelante, ello se refiere al entendido de que estaba mejor preparada que Alfredo para atender la empresa por su trayectoria y conocimiento del mercado y nada aporta a la controversia de que fue desplazada

---

[23] La aludida determinación se refiere a que: "Al tribunal no le mereció crédito el testimonio de la querellante que en Badillo no había métodos o procedimientos para canalizar las quejas de la empresa".

[24] Según arguye la parte apelante, queda más que claro que no importara la prueba o testimonio que presentara la apelante el TPI ya tenía su determinación hecha sobre el caso y así lo demostró durante el juicio con sus determinaciones y expresiones. La apelante realizó las gestiones las cuales nunca se atendieron y se refiere de forma genérica al Apéndice VI, página 358, así como a la TPO, en la página 147, líneas 9-24. Asimismo, señaló: El hecho 24 y 25 son otras determinaciones de hecho que demuestra el ánimo prevenido de la Juez al pasar por alto los testimonios de la apelante y la Psicóloga sobre las actuaciones de la apelada y las consecuencias en la salud emocional de la apelante lo que la llevaron a renunciar a su empleo por ser desplazada y discriminada y se establecerá con la transcripción del juicio, donde claramente se establece el desplazamiento de la apelante de sus funciones sin que se le notificaran los cambios, lo cual se puede identificar en el expediente de la apelante.

[25] El hecho 26 que establece que: "Alfredo Linares, vino de España y sustituyó al Sr. Julio Toro como Director de Medios de Publicis".

por el señor Linares, siendo otra distracción a las controversias del caso. Lo anterior, es parte del valor probatorio y de pertinencia que hizo la Juzgadora sobre la prueba desfilada ante esta. La parte apelante no nos ha puesto en posición de intervenir con tal determinación.

Por otro lado, la parte apelante muestra su inconformidad con la determinación de hecho 28, en la que el foro de instancia estableció que: "Puello nunca llevó queja alguna a Recursos Humanos". En particular, afirma que: "Denota nuevamente que el TPI no revisó el expediente donde claramente no existe una política de discrimen y no escuchó el testimonio de la apelante con el cual se establece las gestiones que realizó con Recursos Humanos solicitando su descripción de tareas lo cual nunca entregaron. Todo ello se establecerá con la transcripción del juicio apéndice de prueba documental que se excluyó del expediente de la apelante."

Nos resulta evidente que, en lugar de la parte apelante hacer un señalamiento puntual sobre las gestiones realizadas con recursos Humanos, opta por hacer un derroche de imputaciones al foro *a quo* que, al estar huérfanas de prueba que así lo demuestren, atentan contra la dignidad del Tribunal. Nos parece cuestionable tal proceder.

Respecto a la determinación de hecho número 30, que establece que: "El puesto como VP Media Director nunca le fue removido", a juicio de la parte apelante, reitera la intención de la parte apelada de evadir su responsabilidad o minimizar los actos de desplazamiento de funciones. Aduce que, "es claro que la apelante fue dejada en su puesto y que no es una alegación que se removiera de su puesto."

Nos llama la atención que, en vez de fundamentar su argumento, se limita a decir que: "La alegación y lo que se estableció en el juicio y se establecerá con la transcripción es que fue despojada

de sus funciones no de su puesto. A fin de mover a este foro revisor, era la obligación de la parte apelante fundamentar adecuadamente su contención y no hacer meras conjeturas. Por lo tanto, no nos persuade en lo absoluto.

La parte apelante también hacer referencia a la determinación de hecho número 31, que estableció que: "El testimonio de la Sra. Puello confirmó que sus funciones variaron a través de los años con las diferentes compañías". La parte apelante, una vez más, en lugar de apoyar su argumento en prueba fehaciente desfilada y admitida, le imputa al foro primario que "es otra determinación equivocada del TPI y demuestra el ánimo prevenido contra la apelante, ya que desvirtúa el testimonio que establecía sus funciones en diferentes puestos, no en el último del cual fue despojada de sus funciones. No estamos de acuerdo con tal proceder.

Respecto a las determinaciones de hecho números 32, 33 y 36, la parte apelante indica que la Juzgadora de instancia obvió parte de la prueba testifical y que: "se establecerá" con la TPO. Lo anterior, sin reseñar específicamente aquellas porciones de la transcripción que apoyan su contención.

A su vez, la parte apelante señala que, "el hecho 37, queda derrotado con el testimonio de la apelante en el juicio y el hecho 19 donde se establecen las funciones de operaciones que realizaba la apelante y que le fueron despojadas." Empero, no aporta prueba alguna que derrote tal determinación.

Por otro lado, la parte apelante está inconforme con la determinación de hecho número 38, que se estableció que: "Aunque se presentó como prueba la carta de renuncia, no se discutieron los pormenores y el contenido de la misma". Esgrime la parte apelante que, "dicha determinación no está más lejos de la verdad, ya que el testimonio de la apelante estableció todos eventos para tomar la decisión de renunciar y se establecerá con la transcripción." Indicó,

además, "que la carta es parte de la prueba documental que se presentó y admitió como prueba, lo cual denota que el TPI no la analizó o tomó en consideración para emitir su sentencia." Este argumento, igualmente, descansa en conjeturas sin apuntar a aquella evidencia específica que lo sustente.

Respecto a la determinación número 39, la parte apelante arguye que, nuevamente denota la intención de minimizar las actuaciones de la apelada y de excluir la parte del testimonio que establece los nombres de las damas y que tanto el señor Linares como las damas son menores que esta. Empero, luego de una revisión ponderada de la prueba desfilada, nos resulta forzoso concluir que la parte apelante no cumplió con el estándar probatorio para demostrar que, en efecto, la parte apelante fue sustituida por otros empleados de menor edad. Coincidimos con la parte apelada, en cuanto a que la parte apelante ni siquiera estableció las edades de las personas que alegadamente sustituyeron a la apelante.

Entre sus planteamientos, la parte apelante alude a la determinación de hecho número 40, respecto a la cual indica que la misma "obvia la explicación de la apelante que se expondrá con la transcripción y también el hecho de que la parte apelada excluyó del expediente presentado la comunicación sobre dicho particular, lo cual informamos al TPI durante el juicio. Ante la situación creada por la prueba presentada y la forma de presentarla nos reservamos la misma para impugnar el testimonio de la señora Cristina, pero no pudo ser presentado por la desestimación. Hacemos la presentación del documento producido por la parte apelada en el descubrimiento de prueba para que este Tribunal tenga ante sí la realidad del caso y haga una determinación conforme a la verdad."

Con referencia a la determinación antes reseñada, particularmente, en cuanto a si le había a la empresa cómo se sentía sobre los eventos que la motivaron a renunciar, en la página 147 de

la TPO, la señora Puello afirmó durante el juicio que la última comunicación la tuvo con la señora Cristina Echevarría.

Asimismo, respecto a los hechos 41 y 42 señala que, más que hechos, estos denotan reiteradamente el ánimo de justificar las actuaciones de la apelada, un ánimo prevenido contra la apelante y desviar la atención de este Honorable Tribunal, por lo que no merece ser tomado en consideración, más aún cuando la apelante claramente declaró las razones por las cuales no dio seguimiento a sus inquietudes las cuales se expondrán con la transcripción.[26]

En el ejercicio de nuestra función revisora, vemos que, de la transcripción de la prueba, específicamente a la página 212, la apelante testificó lo siguiente:

> P     Eh, le pregunto, ¿por qué usted no hizo otra gestión con Cristina luego de ella haberle contestado la petición que usted le hizo?
>
> R     Porque entendía que ella en algún momento iba a contestarme, y nunca sucedió. [.....]

Asimismo, surge de la página 218 de la TPO que la apelante declaró lo siguiente:

> P     Ehm, usted dice que usted, eh, se quejó con Cristina,
> pero no hizo más nada...
>
> R     No.

Sobre las determinaciones de hechos 41 y 42, la parte apelante señala que, "... más que hechos, denotan reiteradamente el ánimo de justificar las actuaciones de la apelada, un ánimo prevenido contra la apelante y desviar la atención de este Honorable Tribunal, por lo que no merece ser tomado en consideración, más aún cuando la apelante declaró las razones por las cuales no dio seguimiento a sus inquietudes las cuales se expondrán con la transcripción."

---

[26] Se refiere a la TPO, pág. 147, líneas 9-25; a la pág.152, líneas 17-25 y a la pág. 153, líneas 1-3.

La argumentación esgrimida por la parte apelante nos conduce inevitablemente a colegir que, ante la ausencia de un fundamento jurídico válido, esta recurre a hacerle imputaciones de parcialidad al foro primario que, en modo alguno, se desprenden de la prueba desfilada. Todo lo anterior, nos obliga a concluir que el primer error señalado no fue cometido.

En su segundo y tercer señalamiento de error, la parte apelante plantea que, erró Tribunal de Primera Instancia al desestimar la demanda al amparo de la Regla 39.2 y al no dictar sentencia a favor de la apelante. Por estar intrínsecamente relaciones estos dos últimos señalamientos de error, los discutiremos de forma conjunta.

En el caso de marras, luego de haber examinado cuidadosa y ponderadamente el expediente ante nuestra consideración, así como la transcripción de la prueba oral, nos resulta inevitable concluir que las determinaciones del foro primario están basadas en la prueba desfilada y no en meras conjeturas como pretende persuadirnos la parte apelante.

Es bien sabido que, como foro revisor, nos encontramos en la misma posición que el foro de primera instancia. En el caso de marras colegimos que, las determinaciones de hechos consignadas en la *Sentencia* corresponden a la credibilidad y el valor probatorio que el foro *a quo* otorgó a la evidencia presentada por la parte apelada. Al examinar los planteamientos esbozados por la parte apelante al cuestionar las determinaciones de hechos alcanzadas por este en su *Sentencia,* luego de revisar la evidencia que tuvo el foro sentenciador ante su consideración, concluimos que los mismos son inmeritorios. Como mencionamos previamente, la parte apelante descansó en meras alegaciones genéricas y no logró controvertir los hechos esbozados como incontrovertidos por la parte

apelada. Consecuentemente, razonamos que, los errores señalados segundo y tercero no fueron cometidos.

**IV**

Por los fundamentos que adelante se exponen, se *confirma* el dictamen apelado.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones